OPINION
Opinion by
Justice SUE LAGARDE
(Retired).
In these State’s appeals only one issue is presented for our review: whether under current state law, the trial court improperly dismissed these cases with prejudice after granting Michael Allen Easton’s special pleas of double jeopardy based on the objective facts and circumstances surrounding the events leading to the defense-requested mistrial. The State contends the prosecutor’s actions were neither intentional nor reckless and Easton’s motion for mistrial in each case was a free and voluntary choice responding to ordinary reversible error to avoid conviction. For reasons that follow, we resolve the State’s issue in its favor, reverse the trial court’s order, and remand these cases to the trial court for further proceedings.

Factual and Procedural Background

In separate indictments, Easton was charged with two offenses: the manufacture of methamphetamine in an amount of four grams or more but less than two hundred grams and endangering a child. The offenses were alleged to have occurred on June 6, 1999. The cases were called for trial on October 15, 2001 and proceeded through October 17, 2001, when a defense-requested mistrial was declared in each case. After a juror indicated he could not follow the trial court’s instruction to disregard certain testimony, the trial court granted Easton’s motion for mistrial in each case. On October 18, 2001, Easton filed a special plea of double jeopardy seeking dismissal of the cases based on prosecutorial misconduct. On January 14, 2002, a special plea hearing was held at which the trial prosecutor was the only witness. At the conclusion of that hearing, the trial court took the matter under advisement. On January 28, 2002, the trial court granted Easton’s special plea and dismissed each case with prejudice. On February 11, 2002, the State appealed.[3] Thereafter, Easton requested findings of fact and conclusions of law, which the trial court denied. On May 13, 2002, this Court abated the appeals to allow the trial court to enter findings of fact and conclusions of law and, on May 28, 2002, a supplemental clerk’s record containing such findings and conclusions was filed. Those exact findings and conclusions in their entirety are attached to this opinion as “Appendix A.”

Evidence at Trial

Three men were arrested on the date of the offenses in question: Easton, Jeffrey Odie, and Ronnie Dale Hill. They were arrested at Easton’s residence, which consisted of two trailers one behind the other, connected by a hallway, located in a rural area of Collin County. Easton was arrested at the entrance to the front trailer; Easton’s common-law wife and infant daughter were located in the front trailer.[4] The arrests were made after members of the Collin County Sheriff’s Department arrived at Easton’s residence to execute a search warrant. The rear trailer con *678 tained evidence of a methamphetamine laboratory. The smell of anhydrous ammonia inside the trailers was overwhelming.
The State called several witnesses during its case in chief, including co-defendant Hill, who had pleaded guilty in exchange for testifying against Easton. Hill testified that he had never met Easton before June 6, 1999, when he went to Easton’s house with Odie to use Easton’s back trailer to cook methamphetamine. Odie told Hill it was a good place to go cook methamphetamine because the trailer was out in the country. Hill did not know how to cook methamphetamine but Odie did, and Hill was there to learn. After the two men entered through the back door of Easton’s trailer, Easton came back and talked to Odie, then went back to the front of the trailer where Hill “guessed” he was keeping a watch out for the cops. Hill had the impression Odie had been there before because Odie seemed “pretty familiar” with where he was. On the day after the arrest, June 7, 2001, Hill gave a written statement in which he stated he and Odie went there to cook methamphetamine and that Easton was not cooking but was the “lookout.”[5] The statement was not admitted into evidence. Before going to Ea-ston’s trailer, Hill had been “up on methamphetamine” for a few days so he didn’t remember many details about the place. Hill testified, however, it was clear Easton knew he and Odie were there to cook methamphetamine. Hill and Odie had been there about fifteen minutes when the officers arrived.
Easton’s defense, as reflected by his counsel’s cross-examination, was that despite Easton’s presence, he was not involved in the methamphetamine manufac-taring process and had no knowledge of it. After Hill testified, the State called Bruce Scovern, the witness whose testimony precipitated the motion for mistrial.
Scovern testified he was thirty years old, worked as a trim carpenter, knew Easton, and was testifying under subpoena. A State’s investigator had interviewed Sco-vern prior to the prosecutor meeting and interviewing him for the first time on the day he testified. No promises had been made to him by the State and he was not currently under indictment. He was not with Easton on June 6, 1999. After testifying he was familiar with the process of cooking methamphetamine, the following exchange occurred between the prosecutor and Scovern:
Q: Now, Mr. Scovern, you are familiar with what’s called cooking methamphetamine, correct?
A: Yeah.
Q. Okay. And, in fact, you have done that before, correct?
A. Yes.
Q. Okay. And, in fact, you did this before with Michael Easton, correct?
A. Yes.
Q. Okay. Can you tell us when that was, please?
Before Scovern answered, defense counsel objected and the jury was excused. Out of the jury’s presence, defense counsel moved for a mistrial, stating to the court the State’s questions implied .that the witness had cooked methamphetamine with Easton on some time other than June 6, 1999, to tar Easton with the brush of generally being a methamphetamine cooker. The trial court construed counsel’s statement to be a rule 404(b) complaint.
*679 Through further development of the record, still outside the jury’s presence, it was determined that, although Easton had made no formal discovery request, the State had provided defense counsel with a courtesy list of the State’s witnesses’ previous convictions and arrests. Scovern’s name was not provided because at the time the list was sent, Scovern was not known to be a potential witness. The list was never supplemented to include Scovern. Apparently Scovern was discovered through a January 19, 2001 handwritten statement he gave following an unrelated arrest for manufacturing methamphetamine. His statement contained references to having been previously involved in similar drug activity with Easton. Sco-vern had been under subpoena for some time before trial, but confirmation was obtained only on the first day of trial. Sco-vern had not been indicted and did not have a lawyer in his case.
Scovern testified he had bought methamphetamine before and had used it with Easton, that Easton had showed Scovern how to steal anhydrous ammonia the first time they attempted to make methamphetamine, and that he and Easton had attempted to make methamphetamine on more than one occasion. In response to direct questions by the trial court about when these events occurred, Scovern testified they occurred around Christmas of 2000 and that he had only known Easton about a year and a half, having first met him in the summer of 2000.
When asked on cross-examination whether he was aware the statements he was now making in court could be used against him, Scovern testified he had been told by the prosecutor and detective just the opposite — that anything he said would not be used against him in his own case. He said they told him if he said anything incriminating they would stop and have an attorney appointed for him.
The State argued that Easton’s knowledge and intent had been placed in issue and such evidence was relevant and probative to his mental state at the time of the offense. The trial court agreed with the State that Easton’s knowledge and intent had been placed in issue; however, the trial court disagreed with the State that evidence of the post-offense events occurring around Christmas of 2000 was relevant to or probative of Easton’s knowledge and intent some eighteen months earlier on June 6, 1999. After the State informed the trial court it did not intend to offer any other extraneous evidence, the trial court concluded the evidence did not meet the rule 404(b) threshold and if it did meet such threshold, its prejudicial effect substantially outweighed its probative value under rule 403.[6] The trial court sustained Easton’s objection and stated it would instruct the jury to disregard all Scovern’s testimony except his name. If all twelve jurors indicated they could and would follow the instruction, the judge would deny Easton’s motion for mistrial; however, if even one juror indicated he or she could not or would not follow his instruction, the judge would grant Easton’s motion for mistrial.
After the jury was returned to the courtroom, defense counsel objected to Scovern’s testimony as inadmissible under rules 404 and 403. The trial court sustained defense counsel’s objection and, upon his request, instructed the jury to disregard all of Scovern’s testimony except his identification. When defense counsel *680 moved for a mistrial, the trial court asked the jurors if they could and would follow the court’s instruction to disregard the testimony to “stick their hand up.” The record reflects that all hands were raised at this point. The following exchange then occurred:
THE COURT: All right. You can put your hands down. The record will reflect that each member of the jury raised his or her respective right hand; in one case a left hand.
Are you waving at me because you have a question, or because you raised your left hand rather than your right hand?
JUROR: I have a question. Would you restate that? With disregarding the last comment—
THE COURT: Yes, sir. If—
JUROR: —I cannot do it.
THE COURT: You cannot do it? Motion for mistrial is granted, Mr. Haynes.
The jury was then excused.

The Law

The double jeopardy clause of both the Fifth Amendment and article 1, section 14 of the Texas Constitution “protect a criminal defendant from repeated prosecutions for the same offense.” Ex parte Peterson, 117 S.W.3d 804, 810 (Tex.Crim.App.2003) (per curiam) (citing Oregon v. Kennedy, 456 U.S. 667, 671, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982); Bauder v. State, 921 S.W.2d 696, 698 (Tex.Crim.App.1996)). Because the trial court specifically found that the prosecutor’s actions were not intentional the only issue before us is whether state law bars retrial.[7]
Under current Texas law, when a mistrial is required by reckless conduct of a prosecutor the double jeopardy provision of the Texas constitution bars retrial. Ex parte Peterson, 117 S.W.3d at 815; State v. Lee, 15 S.W.3d 921, 923 (Tex.Crim.App.2000); Ex parte Bauder, 974 S.W.2d 729, 731 (Tex.Crim.App.1998) (Bander II); Bauder v. State, 921 S.W.2d 696, 699 (Tex.Crim.App.1996) (Bander I). Ex parte Peterson reiterates that under Bander I, Bander II, and Lee the prosecutor’s mens rea is pivotal in determining whether the conduct of the prosecutor is reckless. Ex parte Peterson, 117 S.W.3d at 816.
The above cases instruct that conditions requiring a mistrial “should be considered very unusual in any adversary system.” See id. at 815. Even when a prosecutor offers objectionable and unfairly prejudicial evidence or commits other errors of judgment, these acts will not suffice to necessitate a mistrial unless they are “manifestly improper prosecutorial methods.” Id. The critical inquiry is whether a prosecutor is aware that his manifestly improper misconduct is likely to result in a mistrial, but he nonetheless consciously ignores that likelihood and commits the misconduct. See id. at 816. A prosecutor’s inadvertence, sloppiness, or negligence is not sufficient to erect a jeopardy bar no matter how manifestly prejudicial the result. See id. at 817. Such acts simply trigger a defendant’s “free choice” request for mistrial because of “ordinary reversible error,” with a remedy of appeal to protect a defendant. See id. The double jeopardy clause does not punish prose-cutorial misconduct; it simply ensures that the defendant, not the government, gets to choose whether to go to verdict. See id. *681 (quoting Beringer v. Sheahan, 934 F.2d 110, 113 (7th Cir.1991)).
Ex pmte Peterson clarifies the standards under which the double jeopardy clause of the Texas constitution, as explained in Bander, prohibits retrial after a defendant successfully requests a mistrial. To determine whether a defense-requested mistrial bars retrial under current Texas law, an appellate court must make a three-part analysis: (1) whether manifestly improper prosecutorial misconduct provoke the mistrial; (2) whether the mistrial was required because the prejudice produced from that misconduct could not be cured by an instruction to disregard; and (3) whether the prosecutor engage in that conduct with conscious disregard for a substantial risk that the trial court would be required to declare a mistrial. Ex parte Peterson, 117 S.W.3d at 816-17.
As the movant on a special plea in bar, a defendant has the burden of proof in the trial court to prove his claim by a preponderance of the evidence. In order to meet that burden a defendant must present sufficient evidence on all three prongs of the above analysis. In determining whether such burden has been met, the court must examine the objective facts and circumstances surrounding the events which led to the mistrial in deciding whether the prosecutor’s alleged misconduct was both manifestly improper and committed with the requisite recklessness.
Further guidance is given in Ex paite Peterson concerning what objective facts and circumstances should be examined to determine whether the prosecutor’s alleged misconduct was both manifestly improper and was committed with the requisite intent or recklessness. A reviewing court should consider: (1) whether the misconduct was an attempt to abort a trial that was “going badly for the State.” In other words, at the time that the prosecutor acted, whether it reasonably appeared the defendant would likely obtain an acquittal; (2) whether the misconduct was repeated despite admonitions from the trial court; (3) whether the prosecutor provided a reasonable, “good faith” explanation for the conduct; (4) whether the conduct was “clearly erroneous;” (5) whether there was a legally or factually plausible basis for the conduct, despite its ultimate impropriety; and (6) whether the prosecutor’s actions leading up to the mistrial was consistent with inadvertence, lack of judgment, or negligence, or were they consistent with intentional or reckless misconduct? Id. at 818-19.
On appeal the standard of review is deferential to the trial judge and the trial court’s ruling should be upheld absent an abuse of discretion. Id. However, a de novo standard of review is applied to “mixed questions of law and fact” that do not depend upon credibility and demeanor. See id. (quoting Guzman v. State, 955 S.W.2d 85, 89 (Tex.Crim.App.1997)). Because the trial court’s relevant factual findings do not depend upon an evaluation of credibility and demeanor, we apply a de novo standard of review.[8]
We have conducted anew the previously stated three-prong analysis set out in Ex parte Peterson. We include within our analysis that the prosecutor knew of the risk that the witness Scovern would testify about inadmissible matters and, knowing that risk, the prosecutor chose to proceed by calling the witness Scovern in the presence of the jury.[9]. Even if we consider *682 those conclusions to be factual findings by the trial court, we cannot agree that the trial court’s legal conclusion (e) that “the mis-trials [sic] were caused by the reckless actions of the prosecutor” naturally flows from the objective facts and circumstances in the record. Consciously disregarding a known risk that a witness may testify about inadmissible matters does not meet the Bauder standard of consciously disregarding a substantial risk that the trial court would be required to declare a mistrial. As the court of criminal appeals recently reiterated:
[violations of evidentiary rules and provisions are generally curable with an instruction to disregard. Bauder did not change this rule. It would be extremely rare that admission of evidence in violation of a statute [or evidentiary rule] would be “so emotionally inflammatory that curative instructions are not likely to prevent the jury being unfairly prejudiced against the defendant,” in the absence of a constitutional violation.
Id. at 817 (citing Lee, 15 S.W.3d at 926 n. 8).[10] For the reasons stated above, we resolve the State’s issue in its favor.
We reverse the trial court’s order dismissing these cases and remand them to the trial court for further proceedings.
APPENDIX “A”
Nos. 401-81329-99 & 380-80496-00
THE STATE OF TEXAS
VS.
MICHAEL ALLEN EASTON
IN THE 401st DISTRICT COURT OF COLLIN COUNTY, TEXAS

MEMORANDUM

The Court entered an order granting Easton’s special plea of double jeopardy on January 28, 2002. On May 13, 2002, the Fifth Court of Appeals entered on order granting Easton’s motion for findings of fact and conclusions of law on the special plea. The Court of Appeals ordered the Court to prepare and file findings of fact and conclusions of law within twenty-one days of its order.

FINDINGS OF FACT

1. Michael Allen Easton is charged, under two separate indictments, with (1) manufacture of a controlled substance, namely: methamphetamine of more than 4 grams but less than 200 grams, and (2) endangering a child, alleged to have been committed on June 6,1999.
2. At trial, Mitchell Nolte and Curtis Howard represented the State, and David K Haynes represented Ea-ston.
3. The State began its case-in-chief on October 16, 2001. The State presented the testimony of seven witnesses. The evidence showed that when the Collin County Sheriffs Department executed a search warrant at Easton’s residence, Easton, his common-law wife, their infant daughter, and two other men were present. The residence consists of two trailers attached together. The *683 rear trailer contained evidence of a methamphetamine laboratory.
4. Through cross-examination, the defense sought to show that despite Easton’s presence he was not involved in the manufacturing process.
5. During the trial on these cases (on October 17, 2001), during the State’s case-in-chief, the prosecutor called the witness Bruce Scovern as a State’s witness.
6. Scovern was under subpoena and he knew Easton.
7. The prosecutor’s investigator had interviewed the witness prior to his being called, and had reported the result of this interview to the prosecutor.
8. The prosecutor (Assistant District Attorney Mitchell Nolte) had also interviewed the witness Scovern pri- or to the time that he was called as a witness. Prosecutor Nolte concluded form his interview of the witness that Scovern was not being completely truthful about his knowledge of the case and that he (Nolte) might need to impeach the witness on the stand after calling him to testify.
9. Scovern met the prosecutor for the first time on the day he testified.
10. The prosecutor (Mr. Nolte) despite his prior knowledge of the possible unreliability of the witness, called him to testify in the presence of the jury-
11. Nolte did not obtain a hearing outside the presence of the jury on Scovern’s testimony because he did not want to reveal to the witness how he would impeach him.
12. Once he took the stand, the witness testified that he was familiar with methamphetamine, that he had “cooked” methamphetamine in the past, and that he had done so with the defendant in these cases.
13. Counsel for the defendant lodged an objection to the testimony after the witness had answered the question about having “cooked” with the defendant in these cases.
14. The defendant’s counsel lodged his objection to the witness’s testimony as soon as it was possible to do so, given the speed with which the answer followed the question in the prosecutor’s examination of the witness in the presence of the jury.
15. The jury was excused after the defendant’s counsel lodged his objection, and a hearing was held outside the presence of the jury about the nature of the testimony being proffered by the state from the witness Scovern.
16. At the hearing out of the presence of the jury, it was ascertained that the witness Scovern had first met the defendant in these cases about a year after the events for which he was on trial in these cases.
17. At the hearing out of the presence of the jury, it was ascertained that the witness Scovern had assisted the defendant in these cases in trying to “cook” methamphetamine about six months after they first met.
18. At the hearing out of the presence of the jury, it was ascertained that the Scovern and the defendant in these cases had never succeeded in preparing methamphetamine.
19. The court determined the testimony of the witness Scovern to be inadmissible as evidence in the trial of the defendant’s cases.
*684 20. The Court granted the defendant’s motion to direct the jury to disregard the testimony of Scovern.
21. On the Court’s inquiry, one of the jurors (Walter S. Didriksen) indicated that he could not follow the Court’s instruction to disregard Scovern’s testimony.
22. Thereupon, the court granted the defendant’s motion for mis-trial.
CONCLUSIONS OF LAW
a) The prosecutor knew of the risk that the witness Scovern would testify about inadmissible matters.
b) Knowing that risk, the prosecutor chose to proceed by calling the witness Scovern in the presence of the jury-
c) The testimony of the witness Sco-vern was inadmissible as a matter of the law in the trial of the defendant’s cases because it was irrelevant (taking place 18 months after the events for which the defendant’s was on trial), because it did not show that the defendant or Scovern had previously succeeded in manufacturing methamphetamine (it showed the opposite), and because the slight probative value of the testimony offered was substantially outweighed by the danger of unfair prejudice to Easton.
d) The defendant did not waive his objection to Scovern’s testimony because his counsel lodged his objection as soon as it was possible to do so.
e) The mis-trials were caused by the reckless actions of the prosecutor.
f) Therefore, the re-trial of the defendant’s cases is barred by the Constitution of the State of Texas and the Constitution of the United States of America, and under Bander vs. State.
SIGNED on May 23, 2002.
/s/ Mark J. Rusch
Mark J. Rusch, Judge Presiding
No. 05-02-00234-CR
THE STATE OF TEXAS, Appellant
V.
MICHAEL ALLEN EASTON, Appellee
Appeal from the 401st Judicial District Court of Collin County, Texas. (Tr.Ct.No. 401-81328-00).
Opinion delivered by Justice Lagarde, Justices James and Maloney participating.
JUDGMENT
Based on the Court’s opinion of this date, we REVERSE the trial court’s order dismissing this case and REMAND for further proceedings.
Judgment entered November 25, 2003.
/s/ Sue Lagarde
SUE LAGARDE JUSTICE, ASSIGNED
No. 05-02-00235-CR
THE STATE OF TEXAS, Appellant
v.
MICHAEL ALLEN EASTON, Appellee
Appeal from the 401st Judicial District Court of Collin County, Texas. (Tr.Ct.No. 401-81329-00).
Opinion delivered by Justice Lagarde, Justices James and Maloney participating.
JUDGMENT
Based on the Court’s opinion of this date, we REVERSE the trial court’s order dismissing this case and REMAND for further proceedings.
*685 Judgment entered November 25, 2003.
/s/ Sue Lagarde
SUE LAGARDE JUSTICE, ASSIGNED

. See TexCode Crim. Proc. Ann. art. 44.01(a)(1), (4) (Vernon Supp.2004).

. The offense of endangering a child was based on the child being present while methamphetamine was being manufactured.

. Hill was later cross-examined about the statement also saying Hill was there as a lookout. Hill explained that he had originally gone there to be the lookout but after he arrived he cooked and Easton was the lookout.

. Tex.R. Evid 403. The State correctly points out that defense counsel had not previously lodged a rule 403 objection.

. Inasmuch as federal law requires intentional misconduct to bar retrial, the trial court’s conclusion of law number (f) that retrial is barred by the Constitution of the United States of America is not supported by the record. See Oregon v. Kennedy, 456 U.S. 667, 676 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).

. In applying a de novo standard of review we accept the trial court’s finding of fact number 14 concerning the timeliness of defense counsel’s objection.

. See conclusions of law (a) and (b). We *682 include these to the extent they may be deemed to be factual findings and not conclusions of law.

. Although the record reflects that one juror later stated he could not follow the trial court’s instruction to disregard that is irrelevant to the intent of the prosecutor at the time of the alleged misconduct when viewed against the backdrop of longstanding case law that most error involving improperly admitted evidence is curable.